**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

UNITED STATES *ex rel.* [PARTY X]

        PLAINTIFF,

v.

[PARTY Y]                        **SEALED COMPLAINT**

        DEFENDANTS.

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

UNITED STATES *ex rel.* MAUREEN
DEUTSCH

PLAINTIFF/RELATOR,

v.

HOLLYWOOD PAVILION, LLC
1201 North 37th Ave.
Hollywood, Florida 33021

Serve Also Statutory Agent:
Karen Kallen-Zury
1201 N. 37th Avenue
Hollywood, Florida 33021

and

KAREN KALLEN-ZURY
2421 NE 32nd Court
Lighthouse Point, Florida 33064-8180

and

DAISY MILLER
2713 Scott Street
Hollywood, Florida 33020-1821

and

MICHELE PETRIE
505 NE 16th Avenue
Fort Lauderdale, Florida 33301-1339

DEFENDANTS.

Case No. _____

(Judge _____ )

**COMPLAINT AND JURY DEMAND**

**TO BE FILED UNDER SEAL**

**DO NOT SERVE**

2

## INTRODUCTION

This is an action by qui tam Relator Maureen ("Mo") Deutsch ("Relator" or "Mo Deutsch"), through the undersigned counsel, made on behalf of herself and the United States of America ("United States") to recover damages and penalties arising from Defendants Hollywood Pavilion, LLC, Karen Kallen-Zury, Daisy Miller, and Michele Petrie (collectively, "Defendants") using, making, presenting or causing to present false statements and claims to the government in violation of the False Claims Act, 31 U.S.C. §3729, *et. seq.* The Defendants wrongfully obtained and retained substantial funds from government healthcare programs, including Medicare, though false claims and false statements made in connection with medical services provided by Defendants since at least 2008 and upon information and belief since 2003.

Under the terms of the False Claims Act, this Complaint is to be filed in camera and under seal and is to remain under seal for a period of at least sixty days and shall not be served on the Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within the sixty-day time frame, or within any extensions of that initial sixty-day period granted by the Court for good cause shown, after it receives both the Complaint and the Material Evidence submitted to it.

For her cause of action, the Relator alleges as follows:

## <u>NATURE OF ACTION</u>

1.      This is an action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§3729-3733.

2.      Under the False Claims Act, a private person may bring an action in federal district court for herself and for the United States, and may share in any recovery.  31 U.S.C.

§3730(b).  That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## JURISDICTION

3.      This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 1345.

4.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a) because at least one of the Defendants transacts and has transacted business in the District.

## VENUE

5.      Venue is proper in this District under 31 U.S.C. §3732 and 28 U.S.C. §1391(b) and (c) because at least one of the Defendants resides and/or transacts business in the District.

## PARTIES

6.      The Relator brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS") and its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration ("HFCA")).

7.      The Relator also brings this action on behalf of herself, as permitted under the False Claims Act.  Relator Mo Deutsch is a citizen of the United States and a resident of the State of Florida.  Mo Deutsch has direct and independent knowledge, within the meaning of 31 U.S.C §3730(e)(4)(B), of the information on which the allegations set forth in this Complaint are based.   Mo Deutsch is the original source of these allegations as defined in 31 U.S.C.

4

§3730(e)(4)(B).  Mo Deutsch has knowledge of the false claims and records that Defendants knowingly, falsely, and fraudulently submitted to the federal government as alleged herein.

8.     Not only is the Relator the original source of information contained in this Complaint, but, upon information and belief, the Relator was the person who first exposed Defendants' fraud to the Federal Bureau of Investigation (FBI).  Upon information and belief, the information provided by Relator to the FBI formed the basis of the indictments against Karen Kallen-Zury, Michelle Petrie, and Daisy Miller.

9.     Defendant Hollywood Pavilion, LLC ("Hollywood Pavilion") is a limited liability corporation organized under the laws of Florida with its principal place of business located at 1201 North 37th Avenue, Hollywood, Florida 33021.  Since at least 2001, Hollywood Pavilion has operated in-patient and out-patient medical facilities to provide mental health services.

10.    Upon information and belief, Hollywood Pavilion's annual sales exceed $13 million, a significant portion of which comes from Medicare and other government healthcare programs.

11.    Defendant Karen Kallen-Zury ("Kallen-Zury") is a resident of Broward County, Florida and upon information and belief, at all times relevant to this Complaint, was the Chief Executive Officer of Hollywood Pavilion and its Registered Agent.

12.    Defendant Daisy Miller is a resident of Broward County, Florida, and upon information and belief, at all times relevant to this Complaint, was the Chief Clinical Officer for Hollywood Pavilion's inpatient services.

13.     Defendant Michelle Petrie is a resident of Broward County and, upon information and belief, at all times relevant to this Complaint, was the Director of Hollywood Pavilion's outpatient services.

## THE MEDICARE PROGRAM

14.     In 1965, Congress enacted Title XVIII of the Social Security Act to pay the costs of certain health care services for eligible individuals. 42 U.S.C. §§ 1395 *et seq.*

15.     Medicare consists of two parts. Part A provides coverage for hospital costs, services rendered by skilled nursing facilities, home health care, and hospice care. Part B, on the other hand, provides coverage for physician services, outpatient hospital care, and other miscellaneous medical services such as physical and occupational therapy. *See* 42 U.S.C. §§ 1395j-1395w-4.

16.     The U.S. Department of Health and Human Services ("HHS") is an agency of the United States whose activities, operations, and contracts are paid from federal funds. The Centers for Medicare and Medicaid Services ("CMS") is a division of HHS that is responsible for the administration and supervision of the Medicare program. For the purpose of administering Part A and Part B Medicare reimbursement claims, HHS contracts with private local insurance companies, known as "carriers" and "fiscal intermediaries," to receive, review, and pay appropriate reimbursement claims related to services provided to Medicare beneficiaries. *See* 42 U.S.C. § 1395u.

17.     Medicare providers, such as Defendants, have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare

Manuals. *Heckler v. Cmty. Health Serv. of Crawford County, Inc.,* 467 U.S. 51, 64-65 (1984).

18.     Medicare's enrollment application, which a healthcare provider must complete in order to be eligible to receive Medicare reimbursements, provides, in part:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to [me] . . . I understand that payment of a claim by Medicare is conditioned upon the claims and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

*See* 42 U.S.C. §1395cc; CMS Form 855A (07/11).

19.     Annual cost reports, which psychiatric hospitals must submit, contain an additional relevant notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, or administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil, and administrative action, fines and/or imprisonment may result.

*See* CMS Form 2552-96.

20.     The annual cost report additionally requires the responsible mental health service provider to certify:

> [T]o the best of my knowledge and belief, [the cost report] is a true, correct, and complete report prepared from the books and records of the provider in accordance with applicable instructions, except as noted.
>
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

*See id.*

21.     To submit claims electronically, Medicare providers execute an Electronic Data Interchange Enrollment Form which contains several provisions including one that states: "anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Thus, under Medicare, it is illegal to provide and bill for medically unnecessary services and equipment.

22.     Moreover, for any Medicare claim submission, the health care provider must certify that the claim's contents are correct and complete. *See* CMA Form UB-92, HCFA 1450. Thus, Medicare will not pay claims where the service purportedly rendered was not complete at the time the claim was submitted.

23.     Seeking payment for medically unnecessary services is an act designed to obtain reimbursement for a service that is not warranted by the patient's current and documented medical condition. *See* 42 U.S.C. § 1395y(a)(l)(A).

## MEDICARE COVERAGE AND REIMBURSEMENT TO MENTAL HEALTH SERVICE PROVIDERS

24.     Under the federal Medicare program, "Part A" covers in-patient psychiatric hospitalization services while "Part B" covers outpatient psychiatric services. For all "Part A" and "Part B" claims originating in this District, Medicare contracted with First Coast Service Options ("FCSO") to process and pay all claims.

25.     Medicare reimbursement is only provided for those medical services that are reasonable and necessary. *See* 42 U.S.C. §1395(a)(1)(A).

8

26.    In the context of mental health services, for in-patient hospitalization at a psychiatric hospital, Medicare requires that: (1) the patient must not be able to be actively managed at a lower level of care and must require 24-hour, active treatment; (2) the treatment must be structured and intensive, administered on a 24-hour basis, and tailored to the specific needs of each patient; (3) the treating physician must certify (and, if necessary, recertify) to the medical necessity for the services, develop an individualized plan of treatment or diagnosis, evaluate the therapeutic program at least weekly, and regularly see the patient; and (4) the documentation must include the physician certification(s), the individual psychiatric evaluation, progress notes from treating personnel, including the treating physician, physician's orders, and a treatment plan. *See* Medical Benefit Policy Manual, Chapter 2 ("In-patient Psychiatric Hospital Services"); FCSO Local Coverage Determination L28950 ("Psychiatric Hospitalization"). If any of these requirements is not met, Medicare will not pay the provider's claim.

27.    Medicare requires that for out-patient treatment at a psychiatric hospital: (1) the patient must have a qualifying psychiatric diagnosis; (2) the treatment must be tailored to the individual patient; (3) the treating physician must establish and periodically review the treatment plan, review the patient's medical records, supervise and direct the treating therapists, and periodically see the patient; and (4) the documentation must state the patient's symptoms and medical history, the results of procedures and tests, and the patient's ability to participate in, and benefit from, treatment.  *See* Medical Benefit Policy Manual, Chapter 6 ("Hospital Services Covered Under Part B"). If any of these requirements is not met, Medicare will not pay the provider's claim.

28.    In-patient psychiatric hospitals are required to submit cost reports ("Cost Reports") to Medicare to be used to determine if any additional compensation is due by

Medicare to the in-patient psychiatric hospital for costs incurred by the hospital that are compensable by Medicare.

29.    Medicare regulations require certified billing entities providing in-patient treatment and out-patient treatment to Medicare patients to maintain for at least six years the complete and accurate medical records reflecting the medical assessment and diagnosis of their patients, and to maintain records documenting actual treatment.

30.    Medicare also requires that in-patient psychiatric hospitals submit Credit Balance Reports to Medicare certifying the amount Medicare has overpaid the in-patient hospital or other billing entity during the preceding fiscal year.  In-patient psychiatric hospitals are required to repay Medicare for any overpayment.

## THE FEDERAL ANTI-KICKBACK STATUTE

31.    The federal Anti-Kickback Statute prohibits any remuneration provided in exchange for referring an individual for healthcare services provided by federal health care programs.  *See* 42 U.S.C. §1320a-7b(b).  Thus, the Anti-Kickback Statute prohibits:

> [K]nowingly and willfully solicit[ing] or receiv[ing] any renumeration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program.

*See* 42 U.S.C. §1320a-7b(b)(1)(a).

32.    A provider submitting claims to a federal healthcare program makes the implied representation that the claims being submitted comply with the Anti-Kickback Statute. *United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259-60 (11th Cir. 2005). Therefore, when an entity submits claims derived from an illegal remunerative agreement, the

entity has presented false or fraudulent claims to the United States in violation of the False Claims Act.

## FACTUAL ALLEGATIONS

33.    From at least 2008 and upon information and belief since 2003, Defendants have knowingly engaged in systemic false and fraudulent schemes to defraud government healthcare programs out of significant sums of money.

34.    Relator, Mo Deutsch ("Relator"), has been employed by Hollywood Pavilion as a therapist in its Intensive Outpatient Program ("IOP") since 2007. Relator provides group therapy sessions that consist of process and didactic work exploring emotions, mood stabilization, dual diagnoses, trauma and trauma resolution, anger management, stress management skills, addiction cycle, relapse prevention, recovery process, effective coping skills, sexuality, and grief, loss, and abandonment.   As part of her group therapy sessions, Relator reviews charts and initial assessments, including those completed by Defendant Petrie, and develops treatment plans within 24 hours of a patient's admission to the IOP.   Relator also provides intervening summaries and develops discharge plans.

35.    During the course of her employment, Relator discovered that Defendants were involved in an ongoing scheme of filing false claims for Medicare reimbursement.

36.    Defendants have been knowingly submitting false claims to Medicare and other government healthcare programs through a variety of improper schemes, including, but not limited to, falsely and fraudulently: (1) submitting to Medicare claims based on bribes and kickbacks; (2) submitting claims to Medicare for services that were not medically necessary; (3) submitting claims to Medicare for services that were not eligible for reimbursement; (4)

submitting claims to Medicare for services that were not provided; (5) concealing false and fraudulent claims made to Medicare; and (6) concealing kickbacks and bribes made to Patient Brokers.

## Fraudulently Engaging In A Patient-Brokering Scheme and Submitting to Medicare Claims Based on Bribes and Kickbacks

37.     Defendants Hollywood Pavilion, Kallen-Zury, Miller, and Petrie, in an effort to admit as many patients as possible – regardless of medical necessity and regardless of whether the patient actually qualified for services provided by Hollywood Pavilion – developed a system whereby Patient Brokers  referred patients to Hollywood Pavilion in exchange for kickbacks and/or bribe payments.

38.     Defendants Hollywood Pavilion, Kallen-Zury, Miller, and Petrie specifically arranged for kickbacks and bribes to be paid to Patient Brokers in order to obtain Medicare patients for admission to Hollywood Pavilion. All in-patient and out-patient psychiatric services provided to the Medicare beneficiaries who were referred by Patient Brokers were, in turn, falsely and fraudulently billed to Medicare for reimbursement.

39.     Through communication with patients and other staff, including a charge nurse and a therapist, Relator learned that several Patient Brokers owned "sober houses" in southern Florida and across the country and would refer patients from these sober houses to Defendant Hollywood Pavilion in exchange for payment.  These Patient Brokers would receive payments by check issued by Defendants.  The charge nurse specifically told Relator that Defendant Petrie had relationships with several Patient Brokers from as far away as Chicago,  Baltimore, and

12

Alabama, all of whom would refer Medicare patients to Hollywood Pavilion in exchange for kickbacks.

40.    Relator learned from patients that sober houses like Netty's Nest, Living Sober, Transitions, and Transitions II were part of the patient brokering scheme. Specific Patient Brokers, who were part of this scheme from the sober houses, included Mathus Moore, Keith Humes, Jean Luc Veraguas, and Wyatt Barnfield.   Relator was actually introduced to the managers of these sober houses who were referring Medicare beneficiaries to Hollywood Pavilion by Defendant Petrie.

41.    Upon information and belief, to conceal the patient-brokering scheme, Defendants created false, fictitious, and fake contracts with Patient Brokers so that their relationship with the Patient Brokers would appear legitimate.   The contracts suggested that the Patient Brokers provided marketing or case management services to Hollywood Pavilion, but payments under the contract were never in exchange for legitimate marketing or case management services, but were instead for the referral of Medicare patients to Hollywood Pavilion.   In fact, upon information and belief, during the relevant time period, Hollywood Pavilion did not provide case management services.

42.    Upon information and belief, in furtherance of their scheme, Defendants instructed the Patient Brokers to create false and fictitious invoices for marketing or case management services that were never provided to Hollywood Pavilion.   The effect of these false invoices was to make the payments to the Patient Brokers appear legitimate.   These invoices were faxed to Defendants and others. Many of the invoices, although sent at different times, were

substantively identical.  And, some invoices reported that Patient Brokers worked 20-23 hours in a single day on case management services.

43.     The majority of Medicare beneficiaries referred to Defendant Hollywood Pavilion by Patient Brokers did not meet Hollywood Pavilion admission criteria and required a higher level of care than could ever be offered by Defendant Hollywood Pavilion.  Relator was told by these referred patients that in order to facilitate the patient-brokering scheme, a condition of their continued stay at the sober houses was that they were forced to receive mental health or substance abuse services from the IOP.

44.     Despite the fact that Defendant Hollywood Pavilion had knowledge that these referred patients did not meet admission criteria, Defendant Hollywood Pavilion (and through the actions of other Defendants) fraudulently admitted them anyway.  Patient Brokers, like Barnfield, Moore, Veraguas, and Holmes, admitted to patients that they were being admitted to the IOP even though they were not appropriate for IOP admission. Upon the patient's improper admission to the IOP, the Patient Brokers received their kickbacks.

45.     Hollywood Pavilion accepted Medicare beneficiaries referred by Patient Brokers to artificially increase its daily census and to fraudulently bill Medicare on behalf of these patient beneficiaries, even though many of the patients did not meet Hollywood Pavilion admission criteria.

46.     Hollywood Pavilion required that Relator conduct group therapy sessions with many of the dual-diagnosed Medicare beneficiaries referred by Patient Brokers.  Many of these Medicare beneficiaries refused to participate in the group therapy sessions.  Relator repeatedly denied these Medicare beneficiaries access to her groups.  Relator reported to Defendant Petrie

14

that these patients did not meet Hollywood Pavilion admission criteria and were not participating in group therapy sessions. Defendant Hollywood Pavilion continued to falsely and fraudulently admit these Medicare patients for the same group therapy sessions.

47.     Defendant Petrie would commend the staff when the census reached certain levels, even if some patients had been improperly admitted.  Sometimes, Relator witnessed Defendant Petrie spinning around and clapping her hands and announcing: "The census is at 85!" even though Relator had Medicare beneficiaries in her group sessions who did not meet admission criteria or were not appropriate for IOP admission.

48.     Relator repeatedly told Defendants Petrie and Miller that Patient Brokers were referring patients who were not appropriate for IOP admission and/or who did not meet Hollywood Pavilion admission criteria, but her complaints were completely ignored.  In fact, on one occasion, Defendant Petrie told Relator: "I am the IOP Director and I make the decisions on admissions."

49.     Under Medicare regulations, Defendant Hollywood Pavilion was required to certify that the Medicare beneficiary was benefitting from the services that were offered through the IOP.  Defendants and the Patient Brokers knew that many of their Medicare beneficiaries that the Patient Brokers referred were not appropriate for admission to the IOP and did not meet Hollywood Pavilion admission criteria, but Defendants admitted the patients anyway so that they could fraudulently bill Medicare for medically unnecessary services provided to these patients.

## Falsely and Fraudulently Billing Medicare For Services That
## Were Never Rendered Or Did Not Qualify For Medicare Reimbursement

50.    Similarly, Defendants also billed (or caused to be billed) Medicare for services that were never rendered or for services that did not qualify for Medicare reimbursement.

51.    Upon information and belief, when Defendants were required to submit Cost Reports to Medicare, they concealed the kickbacks and bribes paid to Patient Brokers as reimbursable expenses even though they were actually kickbacks and bribes and not reimbursable Medicare expenses.  Similarly, Defendants certified in the Cost Reports that certain payments to Defendant Kallen-Zury and entities affiliated with Kallen-Zury were Medicare reimbursable expenses although they were not appropriately reimbursable under Medicare.

52.    Defendant Hollywood Pavilion frequently submitted claims to Medicare for time increments of service that were much longer than the time increment of service actually provided to the Medicare beneficiary.

53.    Upon information and belief, Defendant Hollywood Pavilion employed a doctor as a psychiatrist from approximately 2010-2012.  This doctor was paid a daily stipend that required him to spend four hours a day on-site at Hollywood Pavilion performing psychiatric services, but Hollywood Pavilion paid the doctor the same daily stipend regardless of the length of time he actually spent treating Medicare beneficiaries at Hollywood Pavilion.

54.    This doctor approximately spent only one hour a day on-site at Hollywood Pavilion, but still received his stipend.  In order to quickly diagnose patients, thereby minimizing his time on-site at Hollywood Pavilion and maximizing his profit, this doctor rubber-stamped

16

Defendant Petrie's recommendation of the admission of many Medicare beneficiaries, including a majority of patients who did not meet Hollywood Pavilion admission criteria and were not appropriate for IOP admission. In fact, he often spent minimal time diagnosing patients and prescribed medicine to them without appropriately explaining its purpose or side effects.

55.    Defendant Hollywood Pavilion, however, billed Medicare for an amount of time greater than this doctor actually spent with each patient. Many patients reported to Relator that Hollywood Pavilion billed Medicare for 30 minutes of service from this doctor even if he only spent five minutes with a patient.

56.    This doctor scheduled his time on-site at Hollywood Pavilion to avoid complaints from staff and Relator. When Relator complained to Defendant Petrie about this doctor's fraudulent practices, Defendant Petrie would ignore her complaints or change the subject to avoid directly addressing the issue.

57.    Defendants also billed Medicare for in-patient services that did not meet Medicare criteria for in-patient mental health services and were not appropriately reimbursable. Medicare requires that Medicare beneficiaries at in-patient mental health facilities regularly see physicians. Patients informed Relator that Hollywood Pavilion's in-patient Medicare beneficiaries were almost always treated by therapists or interns and rarely by physicians or psychiatrists and rarely saw Hollywood Pavilion's medical director. In fact, in the event patients did see the medical director, the medical director primarily adjusted their medications and did not provide the individualized psychiatric counseling and treatment required by Medicare. Defendant Hollywood Pavilion continued to falsely and fraudulently bill  Medicare for the services provided to these patients as though the beneficiaries were treated by physicians.

58.     Defendants' fraudulent scheme increased the amount of Medicare reimbursement received by Defendant Hollywood Pavilion on a per patient basis even though the Medicare beneficiaries did not receive the services that Defendants claimed that they had received and did not receive services that were properly reimbursable under Medicare.

### Falsely and Fraudulently Billing Medicare for
### Services Provided to Patients Who Did Not Meet Hollywood Pavilion Admission Criteria

59.     Patients are required to meet certain standards for admission to Hollywood Pavilion's in-patient or out-patient treatment programs.

60.     In-patient hospitalization services are only appropriate for patients who cannot be actively managed at a lower level of care and who require 24-hour, active treatment.  In-patient hospitalization requires, among other things, that a physician certify the medical necessity for services, develop an individual plan for the patient to receive such services, and regularly see the patient.  The physician must provide progress notes on the patient's treatment plan.

61.     Out-patient treatment requires that the patient have a qualifying psychiatric diagnosis, that treatment be tailored to the patient, that the treating physician review the patient's treatment plan and see the patient, and the hospital provide documentation of the patient's symptoms and medical history, the results of procedures and tests, and the patient's ability to participate in and benefit from treatment.

62.     Relator witnessed Defendant Petrie improperly admit many Medicare beneficiaries who actually needed a combination of case management and individual therapy that Defendant Hollywood was unable to provide, although other hospitals in the area could have

18

provided the necessary services.  Both case management and individual therapy provide individualized and hands-on treatment, but Hollywood Pavilion offered no case management services in the IOP and generally only offered group therapy in the IOP. Defendant Hollywood Pavilion, however, continued to admit these patients to increase its census and to falsely and fraudulently obtain a reimbursement from Medicare when patients were not benefiting from the services offered by Hollywood Pavilion.

63.    For example, Defendant Hollywood Pavilion (and through the actions of other Defendants) admitted Patient No. 1,[1] a schizophrenic patient who was also delusional and needed both case management and therapy.  Although Defendant Petrie knew Hollywood Pavilion could not provide the case management and  or adequate therapy services Patient No. 1 needed, she approved Patient No. 1's admission anyway and continued to bill Medicare for the inappropriate and ineffective services Hollywood Pavilion provided.

64.    Defendant Petrie also frequently approved the admission of Medicare beneficiaries referred by Patient Brokers although they did not meet criteria for IOP admission at Hollywood Pavilion.  Many Medicare beneficiaries referred by Patient Brokers and admitted to the IOP by Defendants Petrie and Hollywood Pavilion needed a higher level of care than could ever be offered by Hollywood Pavilion's IOP facility.

65.    For many patients, that higher level of care should have been hospitalization in a 30-60 day rehabilitation facility in order to be stabilized.  There were several other Medicare patients who arrived at Hollywood Pavilion so medicated that they could not function, indicating

---

[1] Relator has not disclosed the names or other identifiable information with regard to the specific Medicare beneficiaries mentioned in this Complaint.  This information relating to the beneficiaries is in the possession of Relator's counsel and will be disclosed upon request by this Court and/or the Government.

that they needed in-patient treatment.  Still other patients suffered from psychiatric disorders, like dissociative identity disorder, for which IOP treatment was not effective or beneficial multiple times.  Instead, Defendant Petrie improperly admitted them for IOP services that were inappropriate based on their conditions and billed Medicare for them.

66.     Hollywood Pavilion also engaged in a practice of recycling patients in order maximize its Medicare claims.  Relator witnessed Medicare beneficiaries successively and repeatedly admitted to Hollywood Pavilion's in-patient and out-patient facilities.  Patients would receive services from the IOP and then decompensate and/or relapse.  Based on Defendant Petrie's recommendation and Defendant Miller's, the same patients would then be admitted to Hollywood Pavilion's in-patient facility under Defendant Miller's supervision.  When they were discharged from Defendant Hollywood Pavilion's in-patient facility, they would again decompensate and/or relapse and then be admitted to the IOP.  Patients were continually transferred between Hollywood Pavilion's in-patient and out-patient facilities (and between Defendants Miller and Petrie) with minimal positive results, indicating their admissions were inappropriate.  Defendant Hollywood Pavilion, however, continued to recycle patients, and, contrary to the requirements of Medicare, continued to bill Medicare for the inappropriate and ineffective in-patient and out-patient services it provided.

67.     Many times, when a patient decompensated or relapsed, the patient should not have been admitted to Hollywood Pavilion's in-patient facility for stabilization.  Defendant Hollywood Pavilion's agreements with Patient Brokers required Hollywood Pavilion to treat decompensated and/or relapsed patients until they were sober and stable even if the patients were not appropriate for IOP or in-patient admission.  Although Medicare guidelines require only decompensations related to alcohol or benzodiazepines to receive in-patient stabilization,

Defendants routinely admitted many types of decompensated or relapsed patient to their in-patient facility. Hollywood Pavilion billed Medicare for the time these patients spent in its in-patient facility even though these patients did not meet the admission criteria for Hollywood Pavilion's in-patient unit and were not appropriate for in-patient admission.

68.     Many patients involved in Hollywood Pavilion's recycling scheme initially needed a higher level of care than Hollywood Pavilion could have offered or a long term rehabilitation program that was not available at Hollywood Pavilion.

69.     A significant portion of Medicare beneficiaries treated by the Relator and others at the IOP were part of Hollywood Pavilion's recycling scheme such that patients did not fully meet admission criteria and did not receive appropriate and effective services.

70.     For example, in 2008, Hollywood Pavilion admitted Patient No. 2 with a substance abuse problem who was admitted to the IOP on numerous occasions for treatment related to addictions.  When the treatment offered by the IOP initially failed, Patient No. 2 required either a high level of care than the IOP could offer or long term rehabilitation services not offered by Hollywood Pavilion.  Instead, Defendant Petrie continued to admit her, billed Medicare for the services she received, and then discharged her – only to readmit her again and render the same inappropriate and ineffective services.

71.     Also in 2008, Hollywood Pavilion admitted Patient No. 3 who suffered from mild substance abuse issues, had a mental health diagnosis, and suffered from dissociative identity disorder.  The IOP could not offer the level of services Patient No. 3 required, but Hollywood Pavilion fraudulently admitted her on numerous occasions.  Hollywood Pavilion, in

turn, continued to fraudulently bill Medicare for the services it provided to Patient No. 3 even though those services were ineffective because she required a higher level of care.

72.     In 2009, Hollywood Pavilion fraudulently admitted Patient No. 4., a Medicare beneficiary referred to Hollywood Pavilion from a Patient Broker in Alabama who did not meet admission criteria.  Patient No. 4 was a chronic relapser and lived in a sober house.  Even though therapists at Hollywood Pavilion indicated that their services were ineffective and not beneficial and that the patient needed a higher level of care at a long term rehabilitation facility, Hollywood Pavilion continued to re-admit Patient No. 4 and fraudulently bill Medicare for the ineffective out-patient services it provided her.

73.     In 2009, Hollywood Pavilion admitted several other Medicare beneficiaries who did not meet admission criteria and required a higher level of care than the IOP could ever have provided or required long term rehabilitation services that were not available from the IOP. When the treatment offered by Hollywood Pavilion proved to be ineffective, Hollywood Pavilion nevertheless re-admitted the same patients and continued to provide them with treatment below the level of care they needed and billed Medicare for same.  For example, Patient No. 5 was admitted numerous times while pregnant and living in a drug-infested area of Phoenix.  Patient No. 5 actually needed a higher level of care than Hollywood Pavilion could provide.  In addition, Patient No. 6 was admitted several times because she was a victim of sexual abuse and suffered from dissociative identity disorder.  Her diagnosis indicated that a higher level of care was needed.  Patient No. 7 suffered from dissociative identity disorder resulting from incest and was constantly suicidal and needed a higher level of care than Hollywood Pavilion could offer, but was repeatedly admitted anyway.

22

74.     Patient No. 8 was a mother to three children, had substance abuse problems, and lived with an abusive drug user.  Even though the services offered by the IOP were inappropriate and ineffective for Patient No. 8, Hollywood Pavilion continued to improperly admit her for out-patient services and fraudulently bill Medicare for the same in 2009 and 2012.

75.     In 2010, Defendant Hollywood Pavilion admitted Patient No. 9 who was a Vietnam veteran suffering from heroin and opiate addiction.  Patient No. 9's addiction problems required a higher level of care than Defendant Hollywood Pavilion could offer, but Defendant Hollywood Pavilion never investigated discharging him to a higher level of care facility at a VA Hospital Program and continued to fraudulently bill Medicare for the inappropriate and ineffective services it was providing to him. Patient No. 9 expired in Defendant Hollywood Pavilion's care in 2011, while he was still suffering from the very problems for which he sought treatment.

76.     Defendants also determined the length of patient stays based on the highest Medicare reimbursement possible and not based on the patient's actual medical needs. Defendants required Relator to discharge Medicare patients approximately six months after they had been admitted regardless of whether their conditions warranted discharge because Defendants were aware that Medicare reimbursement would decrease after six months.

77.     Upon information and belief, even though Defendant Kallen-Zury and other Defendants knew that Hollywood Pavilion had been overpaid by Medicare, she certified or caused to be certified, Credit Balance Reports indicating that Medicare had not overpaid for services rendered to Medicare beneficiaries at Hollywood Pavilion.

23

78.     Defendants admitted patients who did not meet the requirements of Hollywood Pavilion's IOP or in-patient facilities and for whom Hollywood Pavilion's services were inappropriate and ineffective.  Defendants therefore falsely and fraudulently obtained Medicare reimbursements as a result of the perpetuation of their fraudulent schemes.

## Concealing False and Fraudulent Claims Made to Medicare

79.     To conceal their activities, Defendants also caused false, misleading, and inaccurate information to be included in patient files and related documents to support the claims Defendants were making on behalf of Medicare beneficiaries.

80.     Upon information and belief, after learning that the government was investigating potential Medicare fraud, but after Medicare beneficiaries' claims had been submitted to Medicare, Defendants caused false, inaccurate, or misleading information to be added to patient charts.

81.     Starting in early 2012 and continuing until September 2012, Relator witnessed Defendants relocating all patient files to a room where Defendants Petrie and Miller and certain therapists would review and, upon information and belief, fraudulently alter them.

82.     Defendants' attempt to conceal their false and fraudulent activities perpetuated their scheme to defraud Medicare.

24

**COUNT I**
**VIOLATION OF THE FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1) (1990) / 21 U.S.C. §3729(a)(1)(A) (2009)**

83.     Relator incorporates by reference the allegations set forth in Paragraphs 1 through 84 as though fully set forth herein.

84.     As set forth above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to officials of the United States Government in violation of 31 U.S.C. §3729(a)(1) (1990) and 31 U.S.C. §3729(a)(1)(A) (2009).

85.     By virtue of the false or fraudulent claims made by Defendants, the  United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT II**
**VIOLATION OF THE FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(2) (1990) / 31 U.S.C. §3729(a)(1)(B) (2009)**

86.     Relator incorporates by reference the allegations set forth in Paragraphs 1 through 87 as though fully set forth herein.

87.     As set forth above, Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(2) (1990) and 31 U.S.C. §3729(a)(1)(B) (2009).

88.     By virtue of the false records or statements made by Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT III
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(3) (1990) / 31 U.S.C. §3729(a)(1)(C) (2009)

89.     Relator incorporates by reference the allegations set forth in Paragraphs 1 through 90 as though fully set forth herein.

90.     As set forth above, Defendants knowingly conspired to commit a violation of the False Claims Act in violation of 31 U.S.C. § 3729(a)(3) (1990) and 31 U.S.C. § 3729(a)(1)(C) (2009 amendments).

91.     By virtue of the false records or statements made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT IV
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(7) (1990) / 31 U.S.C. §3729(a)(1)(G) (2009)

92.     Relator incorporates by reference the allegations set forth in Paragraphs 1 through 95 as if fully set forth herein.

93.     As set forth above, Defendants knowingly made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. §3729(a)(7) (1990) and 31 U.S.C. §3729(a)(1)(G) (2009).

94.     By virtue of the false records or statements made by Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### PRAYER FOR RELIEF

WHEREFORE, the United States and the Relator demand that judgment be entered against Defendants and in favor of the Relator and the United States as follows:

1.     On the First, Second, Third, and Fourth Causes of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law;

2.     That the Relator be awarded the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d);

3.     That the Relator shall be awarded all costs and expenses of this action, including attorney fees, expenses, and costs as permitted by 31 U.S.C. §3730(d).

4.     That the United States and Relator receive all such other relief as may be just and proper.

27

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Respectfully submitted,

KATZ BARRON SQUITERO FAUST
Attorneys for Plaintiff/Relator Mo Deutsch
100 N.E. 3rd Ave.
Suite 230
Ft. Lauderdale, FL 33301
Telephone: (954) 552-3636
Facsimile: (954) 552-5119

By: _____
    Mark R. Osherow, FBN: 997013
    mro@katzbarron.com
    Kenyetta Alexander, FBN: 036815
    kna@katzbarron.com

KEATING MUETHING & KLEKAMP PLL
Attorneys for Plaintiff/Relator Mo Deutsch
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202-3752
Telephone: (513) 579-6400
Facsimile: (513) 579-6457

By: _____
    Gregory M. Utter (*pro hac vice pending*)
    gmutter@kmklaw.com
    Joseph M. Callow, Jr. (*pro hac vice pending*)
    jcallow@kmklaw.com
    Danielle M. D'Addesa (*pro hac vice pending*)
    ddaddesa@kmklaw.com

ATTORNEY AT LAW
Attorneys for Plaintiff/Relator Mo Deutsch
3540 Ridgecroft Dr.
Lynchburg, VA 24503
Phone: (434) 592-4251

By: _____ *and per e-mail authorization*
    Joel Hesch (*pro hac vice pending*)

29

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 17th day of December, 2012, a copy of the foregoing Complaint and the required Disclosure Statement was served on the individuals below, via FedEx delivery, at the addresses below:

Hon. Eric H. Holder, Jr.
Attorney General of the United States
950 Pennsylvania Avenue
Room 4400
Washington, D.C. 20530-0001


Hon. Wilfredo A. Ferrer
United States Attorney
United States Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132


Hon. Mark Lavine
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132

Danielle M. D'Addesa

4600040.9

30